## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
## AMARILLO DIVISION

REPRESENTATIVE RONNY JACKSON, in his individual capacity and as U.S. Representative for Texas's 13th Congressional District, and REPRESENTATIVE DARRELL ISSA, in his individual capacity and as U.S. Representative for California's 48th Congressional District,

      Plaintiffs,

          v.

SHIRLEY N. WEBER, in her official capacity as California Secretary of State, and GAVIN NEWSOM, in his official capacity as Governor of California,

      Defendants.

Case No.

**COMPLAINT**

**JURY TRIAL DEMANDED**

---

Plaintiffs, REPRESENTATIVE RONNY JACKSON ("Representative Jackson") and REPRESENTATIVE DARRELL ISSA ("Representative Issa") (together "Plaintiffs"), by and through undersigned counsel, bring this action against Defendants SHIRLEY N. WEBER, in her official capacity as California Secretary of State ("Secretary Weber") and GAVIN NEWSOM, in his official capacity as Governor of California ("Governor Newsom") and allege as follows:

## <u>INTRODUCTION</u>

1.    This action challenges the Election Rigging Response Act, Assem. Const. Amend. No. 8, 2025 Cal. Stat., ch. 156 ("ACA 8" or "the ERRA") and the resulting Proposition 50 ballot measure as unconstitutional violations of the Equal Protection Clause (U.S. Const. amend. XIV), the Elections Clause (U.S. Const. art. I, § 4), and the Guarantee Clause (U.S. Const. art. IV, § 4).

2.      Unlike typical redistricting challenges, this case involves an unprecedented interstate assault on representative democracy: California's deliberate attempt to nullify the electoral choices of citizens in both its own (California) and other states (aimed particularly at Texas) by manipulating congressional district boundaries mid-decade for the express purpose of seizing control of the U.S. House of Representatives.

3.      Plaintiffs bring this action both as individual Members of Congress whose ability to represent their constituents will be directly and immediately impaired, and as voters whose own votes will be diluted by California's unconstitutional redistricting scheme.

4.      Plaintiff Representative Ronny Jackson represents Texas's 13th Congressional District and will lose specific, concrete resources and authority necessary to serve his constituents because California's scheme will succeed in flipping House control.

5.      Plaintiff Representative Darrell Issa represents California's 48th Congressional District and faces both the loss of representational capacity and the dilution of his own vote as a California voter through districts drawn in violation of one person, one vote principles and California constitutional law.

6.      California Assembly Constitutional Amendment No. 8, known and cited as the "Election Rigging Response Act,"[1] passed into law on August 21, 2025, is a plainly unconstitutional and retaliatory piece of legislation targeted against Texas and affecting the California electorate, their citizens, and their congressional delegation including Plaintiffs, and Defendants must be enjoined from enforcing the ERRA's provisions

---

[1] Election Rigging Response Act, (filed with Secretary of State on August 21, 2025), available at https://leginfo.legislature.ca.gov/faces/billNavClient.xhtml?bill_id=202520260ACA8.

## THE PARTIES

7.    Plaintiff Representative Ronny Jackson is a citizen of the United States and the State of Texas. He represents Texas's 13th Congressional District in the U.S. House of Representatives. Representative Jackson is the House majority-elected Chairman of the Subcommittee on Oversight and Investigations of the House Permanent Select Committee on Intelligence and Chairman of the Subcommittee on Intelligence and Special Operations of the House Armed Services Committee. He maintains his principal residence within the Northern District of Texas, Amarillo Division.

8.    Plaintiff Representative Darrell Issa is a citizen of the United States and the State of California. He represents California's 48th Congressional District in the U.S. House of Representatives. Representative Issa is the Vice Chair of the Committee on Foreign Affairs and is the Chairman of the Subcommittee on Intellectual Property, Artificial Intelligence, and the Internet on the Committee on Judiciary. As both a Member of Congress and a registered California voter residing in the proposed Congressional District 49 under AB 604, Representative Issa faces dual injuries from Defendants' unconstitutional actions.

9.    Defendant Shirley N. Weber, sued in her official capacity, is the Secretary of State of California and the state's Chief Elections Officer. She is responsible for implementing the ERRA, certifying the Proposition 50 election results, and administering congressional elections under any redistricting plan California adopts.

10.    Defendant Gavin Newsom, sued in his official capacity, is the Governor of California. He championed and promoted the ERRA, signed both ACA 8 and AB 604 into law, called the special election on Proposition 50, and has specifically targeted Texas and its

congressional delegation in promoting California's redistricting scheme. Governor Newsom has established a ballot measure committee actively campaigning for Proposition 50's passage.

## JURISDICTION AND VENUE

11.     This Court has subject matter jurisdiction under 28 U.S.C. § 1331 (federal question jurisdiction), 28 U.S.C. § 1343 (civil rights jurisdiction), 28 U.S.C. § 2201 (declaratory judgment), and 28 U.S.C. § 2284 (three-judge court for apportionment challenges).

12.     This action arises under the Equal Protection Clause, 42 U.S.C. § 1983, the Elections Clause, and the Guarantee Clause.

13.     Venue is proper under 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to Plaintiffs' claims occurred in this District, and under 28 U.S.C. § 1391(b)(3) because Defendants' conduct is directed at and causes injury in this District.

14.     Personal Jurisdiction over Defendants exists because:

   a.   Defendants purposefully directed their unconstitutional scheme at Texas, its citizens, and its congressional delegation, including Plaintiff Jackson;

   b.   The ERRA's legislative findings expressly target Texas's redistricting efforts and identify Texas by name;

   c.   Defendant Newsom has purposefully availed himself of Texas by running political advertisements in Texas newspapers (Austin American-Statesman, Houston Chronicle, El Paso Times) specifically targeting Texas officials and policies;

   d.   Defendants' actions are calculated to and will directly harm Plaintiff Jackson in his capacity as Chairman of two subcommittees, causing him to lose specific resources and authority he exercises from within this District;

e. Defendants' scheme aims to dilute the representative capacity of all Texas Republican members of Congress, with foreseeable impact in this District where Plaintiff Jackson resides and serves his constituents;

f. Defendants knew that their intentional targeting of the political composition of Congress would cause concrete injury to Members representing districts in Texas, including this District.

### AB 604 AND ITS IMPACT ON PLAINTIFFS

*A. California's Transparent Political Manipulation*

15.    On August 21, 2025, the California Legislature passed and Defendant Newsom signed into law the Election Rigging Response Act, consisting of three coordinated pieces of legislation:

a. Assembly Constitutional Amendment 8: A legislatively-referred constitutional amendment that would temporarily suspend the authority of California's independent Citizens Redistricting Commission and implement a new congressional district map for the 2026, 2028, and 2030 elections;

b. Assembly Bill 604 ("AB 604"): Legislation establishing new congressional district boundaries drawn by the Legislature for partisan advantage; and

c. Senate Bill 280 ("SB 280"): Legislation calling a statewide special election for November 4, 2025, asking voters to approve ACA 8 as "Proposition 50."

16.    California's actions represent an unprecedented mid-decade partisan gerrymander utilizing stale census data to the detriment of individual voters in the subject districts. This course of action was explicitly undertaken in direct response to efforts by Texas's Republican-controlled

state legislature, while undermining the bedrock principle of one person, one vote, a harm also suffered by Plaintiff Issa.

17.    The California Legislature's findings accompanying the ERRA make its partisan purpose explicit:

      a.    "The State of Texas has convened a special session of its Legislature to redraw congressional district maps to unfairly advantage Republicans";

      b.    "President Trump and Republicans are attempting to gain enough seats through redistricting to rig the outcome of the 2026 United States midterm elections regardless of how the people vote";

      c.    "President Trump's election-rigging scheme is an emergency for our democracy";

      d.    "The 2026 United States midterm elections are voters' only chance to provide an essential check and balance against President Trump's dangerous agenda."

18.    The ERRA further states: "It is the intent of the people that California's temporary maps be designed to neutralize the partisan gerrymandering being threatened by Republican-led states without eroding fair representation for all communities."

19.    Governor Newsom has been unequivocal about California's retaliatory and partisan intent. In promoting the ERRA and Proposition 50, he has:

      a.    Established a "Yes on 50" campaign committee seeking nationwide funding, *see e.g.* https://perma.cc/T3XW-DAKD;

      b.    Made public statements characterizing the redistricting as necessary to "fight back" against Republican efforts;

    c.   Specifically identified Texas and its leadership as targets of California's response;

    d.   Previously run political advertisements in Texas newspapers attacking Texas Governor Greg Abbott and Texas policies.

20.    AB 604's congressional map was drawn by the California Legislature—not the independent, nonpartisan Citizens Redistricting Commission that California voters established through Proposition 20 in 2010, which currently consists of 5 Democrats, 5 Republicans, and 4 members unaffiliated with either party.

*B.   Violations of California's Own Constitutional Requirements*

21.    California Constitution Article XXI, § 1 currently provides that congressional redistricting "shall" occur "in the year following the year in which the national census is taken under the direction of Congress at the beginning of each decade."

22.    The last decennial U.S. Census was conducted in 2020. California's current congressional districts were drawn by the Citizens Redistricting Commission in 2021 based on 2020 Census data. The next decennial census will occur in 2030, with redistricting to follow in 2031.

23.    The ERRA proposes mid-decade redistricting in 2025—five years after the census and four years before the next scheduled redistricting cycle.

24.    California Constitution Article XXI, § 2(e) prohibits the drawing of districts "for the purpose of favoring or discriminating against an incumbent, political candidate, or political party."

25.    AB 604's map violates this prohibition, as evidenced by the Legislature's own findings admitting the map is designed to "neutralize partisan gerrymandering" and ensure Democrats can "provide an essential check and balance" in Congress.

26.    The California Supreme Court in *Legislature v. Deukmejian*, 34 Cal. 3d 658 (1983), established that:

    a.  California's Constitution limits redistricting to once per decade, following the national census;

    b.  This limitation cannot be circumvented through ordinary legislation;

    c.  Mid-decade redistricting is permissible only if accomplished through constitutional amendment or if a prior plan is invalidated by courts or referendum;

    d.  The people of California retain the power to amend their Constitution to authorize different redistricting procedures.

27.    While ACA 8 purports to temporarily amend California's Constitution through the referendum process, it does so through a legislatively referred amendment rather than a citizen initiative and does so in explicit violation of the anti-gerrymandering principles California voters embedded in their Constitution.

28.    More fundamentally, even if California voters approve Proposition 50, the resulting redistricting violates federal constitutional requirements that constrain even state constitutional amendments.

*C.  Use of Stale Census Data Without Current Population Information*

29.    AB 604's congressional districts are based entirely on 2020 decennial Census data, now more than five years old.

30.    Significant population changes have occurred in California since 2020, particularly:

 a.    Devastating wildfires in 2024 and early 2025 displaced tens of thousands of residents from Pacific Palisades, Malibu, Altadena, and other communities;

 b.    Continued migration patterns out of California, particularly from urban coastal areas;

 c.    Natural population changes through births, deaths, and migration;

 d.    Economic and social changes affecting population distribution.

31.    The Legislature made no effort to obtain updated population data or account for known population shifts when drawing AB 604's districts.

32.    AB 604's districts show population deviations that, while minimal when measured against 2020 Census data, fail to account for five years of population change.

33.    For districts where the population has significantly decreased (such as areas affected by wildfires), voters' electoral weight is artificially inflated. For districts where the population has increased, voters' electoral weight is diluted.

34.    The ideal population for each congressional district under AB 604, calculated using 2020 Census data, is 760,066 persons. AB 604's districts deviate from this ideal by no more than one person—but only when measured against stale 2020 data, not current actual population.

35.    Plaintiff Issa's district under AB 604 would be redrawn as proposed District 49, which, according to 2020 data, contains 760,066 persons—exactly equal to the ideal district size. However, this figure does not reflect current population distributions, particularly given significant demographic shifts in Southern California since 2020.

36.     The current congressional map, drawn in 2021 using the same 2020 Census data, would continue to reflect accurate population distributions just as well or poorly as AB 604's map. The only difference is AB 604's partisan configuration of district lines.

37.     This constitutes malapportionment because it involves the unequal distribution of people across district lines, resulting in citizens in less-populated districts having votes that carry more weight than citizens in more-populated districts.

38.     "Districts shall comply with the United States Constitution. Congressional districts shall achieve population equality as nearly as is practicable, and Senatorial, Assembly, and State Board of Equalization districts shall have reasonably equal population with other districts for the same office, except where deviation is required to comply with the federal Voting Rights Act or allowable by law." Article XXI, Section 2(d)(1) of the California Constitution (which ACA 8 does not invalidate).

### D. Concrete, Imminent Injuries to Plaintiff Jackson

39.     Plaintiff Jackson currently serves as:

     a.  Chairman of the House Permanent Select Committee on Intelligence Subcommittee on Oversight and Investigations, with specific authority to (i) Direct and supervise all committee investigations within the subcommittee's jurisdiction; (ii) Issue subpoenas for testimony and documents (with full committee approval); (iii) Control the subcommittee's budget and staff allocation; (iv) Set the subcommittee's agenda and hearing schedule; and (iv) Receive classified briefings and intelligence materials related to oversight matters,

https://jackson.house.gov/news/documentsingle.aspx?DocumentID=2269
(last visited October 28, 2025);

b.  Chairman of the House Armed Services Committee Subcommittee on Intelligence and Special Operations, with authority to: (i) Oversee Department of Defense intelligence activities; (ii) Direct oversight of special operations forces and related programs; (iii) Control subcommittee resources and staffing; (iv) Access classified defense intelligence programs and facilities; and (v) Conduct oversight hearings and investigations, https://www.amarillo.com/story/news/2025/01/08/ronny-jackson-appointed-chairman-of-housearmed-services-subcommittee/77547168007 (last visited October 28, 2025).

40.  As subcommittee chairman, Plaintiff Jackson currently has access to:

a.  22 professional staff members (compared to 8 minority staff members on comparable subcommittees), including: (i) Intelligence analysts with Top Secret/SCI clearances; (ii) Investigators with subpoena authority; (iii) Legal counsel specialized in intelligence and defense law; and (iv) Subject matter experts on defense intelligence and special operations;

b.  Budget authority to direct committee resources toward investigations and oversight priorities affecting his constituents;

c.  Facilities access, including regular access to classified facilities (SCIFs) and classified briefing materials related to intelligence and defense matters; and

    d.   Scheduling authority to convene hearings, investigations, and briefings at times and on matters relevant to – and at the urging of – his constituents' interests.

41.    These resources and authorities enable Plaintiff Jackson to represent his constituents' interests in concrete, specific ways:

    a.   Texas's 13th Congressional District includes significant military installations, including Sheppard Air Force Base and national security-related government facilities, including the Pantex Plant – one of six production facilities in the National Nuclear Security Administration's Nuclear Security Enterprise. Plaintiff Jackson's chairmanship of the Intelligence and Special Operations Subcommittee enables him to conduct oversight affecting these installations and the servicemembers and families who live in his district;

    b.   As chairman, Plaintiff Jackson can direct staff resources toward investigations and oversight of intelligence community contracts and expenditures that affect Texas businesses and employers in his district;

    c.   His access to classified intelligence briefings enables him to advocate for his constituents on national security matters affecting Texas, including border security, counterterrorism, and defense priorities;

    d.   His subcommittee hearing authority allows him to call witnesses from executive agencies to address constituent concerns about intelligence and defense matters.

42.    If Proposition 50 passes and AB 604's map is implemented for the 2026 elections, these concrete authorities and resources will be immediately jeopardized because:

a. California currently has 43 Democratic representatives and 9 Republican representatives (of 52 total);

b. AB 604's map is designed to increase Democratic seats in California's congressional delegation;

c. The current House of Representatives has a narrow Republican majority of 219-213 (with 3 vacant);

d. If California Democrats gain even 2-3 additional seats in the 2026 elections, and no other seats nationwide change party control, Democrats would control the House beginning in January 2027;

e. Expert analysis shows AB 604's map could yield 4-6 additional Democratic seats compared to the current map, based on historical voting patterns in the reconfigured districts.

43.    If Democrats take control of the House in January 2027, Plaintiff Jackson will immediately and automatically lose:

a. His chairmanship positions on both subcommittees—these positions are held only by members of the majority party and will transfer to Democratic members;

b. Professional staff members and committee staff members, as minority staff allocations are substantially smaller than majority staff;

c. Budget and scheduling authority for his subcommittees, which will pass to the new Democratic chairmen;

d. Primacy in accessing classified materials and setting the agenda for oversight and investigation;

e.  Subpoena power and investigative direction.

44.  These losses constitute concrete, particularized injuries to Plaintiff Jackson's ability to represent his constituents:

a.  With substantially reduced staff, he will be unable to conduct the same level of oversight and investigation into intelligence and defense matters affecting his district and constituents;

b.  Loss of scheduling authority means he cannot ensure hearings address priorities identified by his constituents;

c.  Reduced access to classified materials impairs his ability to stay informed on national security matters affecting Texas;

d.  Loss of these specific authorities diminishes the representative value his constituents receive from having elected him.

45.  These injuries are not speculative:

a.  When Proposition 50 passes on November 4, 2025, the new map will be implemented for the 2026 congressional elections;

b.  The Secretary of State will certify results by December 12, 2025;

c.  Candidate filing for the June 2, 2026 primary begins in mid-December 2025;

d.  The primary election occurs on June 2, 2026;

e.  The general election occurs on November 3, 2026;

f.  Any newly elected members will take office on January 3, 2027;

g.  Committee assignments and chairmanships are determined immediately when the new Congress convenes;

14

h. Within days of January 3, 2027, Plaintiff Jackson will lose his chairmanships when the Democratic party controls the House.

46. Unlike the situation in *Raines v. Byrd*, where the plaintiffs' claimed injury affected all members of Congress equally, Plaintiff Jackson's injuries are personal and particularized:

a. He currently holds specific positions (subcommittee chairmanships) that other members do not hold;

b. He has specific authorities (subcommittee chairman powers) that other members lack;

c. He serves a specific district (TX-13) with military installations and defense industry presence that makes his intelligence and special operations oversight particularly valuable to his constituents;

d. His constituents derive specific value from his chairmanships that would be lost if Democrats take control.

47. Unlike the situation in *Raines*, Plaintiff Jackson is not simply alleging "loss of political power" in the abstract. He faces the imminent loss of concrete, specific authorities and resources that enable him to fulfill his representative duties to his constituents.

*E. Concrete, Imminent Injuries to Plaintiff Issa*

48. Plaintiff Issa faces distinct and dual injuries as both a Member of Congress and as a California voter residing in a district that will be redrawn under AB 604.

49. As a Member of Congress, Plaintiff Issa currently serves as:

a. A senior member of the House Committee on Foreign Affairs, with: (i) Seniority that grants him priority in questioning witnesses; (ii) Staff allocation commensurate with majority party status; and (iii) Authority to

shape    legislative    priorities    on    foreign    policy    matters, https://issa.house.gov/about/committees-and-caucuses (last visited October 28, 2025);

b. A senior member of the House Committee on Judiciary, with: (i) Seniority-based authority over legislative matters; (ii) Resources to serve constituents on immigration and legal matters; and (iii) Access to oversight and investigatory materials, *id*.

50.    Plaintiff Issa's district (CA-48) includes:

a. Substantial military and veteran populations benefiting from his committee work;

b. Border communities affected by immigration policy;

c. Agricultural and business interests requiring his legislative attention;

d. Immigrant communities requiring his advocacy on foreign affairs and immigration matters.

51.    If Democrats take control of the House due to AB 604's implementation, Plaintiff Issa will lose:

a. Seniority advantages in committee proceedings;

b. Reduced staff allocation as a minority member;

c. Ability to shape committee agendas affecting his constituents;

d. Priority access to witnesses, oversight materials, and legislative opportunities.

52.    As a California voter and resident, Plaintiff Issa faces additional, distinct injuries:

a. He is a registered California voter residing in the area that will become Congressional District 49 under AB 604;

b. His vote will be diluted by districts drawn in violation of one person, one vote principles;

c. His vote will be manipulated for partisan advantage in violation of California's constitutional prohibition on partisan gerrymandering;

d. He will be deprived of the independent, nonpartisan redistricting process California voters enacted through Proposition 20.

53. Plaintiff Issa's injuries as a voter are concrete and imminent:

a. If Proposition 50 passes, he will cast votes in the 2026, 2028, and 2030 elections in districts drawn unconstitutionally;

b. His vote in the June 2, 2026 primary election will occur in an unconstitutionally drawn district;

c. The filing period for that election begins in December 2025—less than two months away;

d. Candidates are already positioning themselves based on AB 604's proposed lines.

54. Plaintiff Issa can demonstrate injury as both a Member of Congress and as a voter affected by California's redistricting. This dual standing provides independent bases for this action.

*F. But for Defendants' Actions, Plaintiffs Would Not be Harmed*

55. Plaintiffs' injuries are directly caused by Defendants' implementation of the ERRA and Proposition 50:

a. But for California's adoption of AB 604's map, the current congressional districts (drawn by the nonpartisan Commission in 2021) would remain in effect;

b. But for AB 604's partisan configuration, Democrats would not gain additional California House seats in 2026;

c. But for those additional Democratic seats, the House would likely remain under Republican control;

d. But for the change in House control, Plaintiffs would retain their current authorities and resources.

56. The chain of causation is not speculative:

a. Election analysts uniformly predict AB 604's map will yield 4-6 additional Democratic seats compared to current districts;

b. The current House majority margin is only 3-6 seats;

c. Historical voting patterns in the reconfigured districts make Democratic gains highly likely;

d. No intervening event beyond the 2026 election is required—the injury occurs automatically on January 3, 2027 when committee assignments are made.

57. Plaintiffs' injuries are redressable:

a. An injunction preventing implementation of AB 604's map would maintain current district lines;

b. Maintaining current lines would prevent Democrats from gaining the additional seats AB 604 is designed to provide;

c. Preventing those gains would prevent the flip in House control;

d. Maintaining Republican House control would preserve Plaintiffs' current authorities and resources;

e.  For Plaintiff Issa as a voter, an injunction would ensure his 2026 votes are cast in constitutionally drawn districts.

## CLAIMS FOR RELIEF

### COUNT I
*Violation of Equal Protection—One Person, One Vote*
*U.S. Const. amend. XIV*

58.    Plaintiffs reallege and incorporate by reference all preceding paragraphs.

59.    AB 604's congressional map violates the one person, one vote requirement in multiple respects:

*A.  Use of Stale Census Data*

60.    AB 604 relies entirely on 2020 Census data that is now over five years old and fails to reflect known, substantial population changes.

61.    While states are permitted to use decennial census data for redistricting immediately following the census, the constitutional justification for doing so rests on the data's accuracy and currency.

62.    By 2025—five years after the census—the 2020 data no longer provides a constitutionally adequate basis for ensuring equal population districts, particularly where:

a.  Known population changes have occurred (including wildfire displacement of tens of thousands);

b.  The Legislature made no effort to obtain updated data;

c.  The redistricting is voluntary, mid-decade, and undertaken for partisan advantage rather than to correct malapportionment.

63.    AB 604 authorizes mid-decade redistricting using stale census data where population shifts are known and substantial.

64. California's mid-decade redistricting does not immediately follow the 2020 Census; it occurs five years after the census, with five years of known population changes unaccounted for.

65. Rather than engage in mandatory, post-census redistricting, Defendants have engaged in voluntary mid-decade redistricting undertaken for partisan advantage.

B. *Partisan Motivation Without Good Faith Effort*

66. AB 604's use of 2020 census data is not the product of a good-faith effort to achieve equal representation but rather a deliberate choice to facilitate partisan advantage.

67. The Legislature could have:

   a. Obtained updated population estimates from state databases;

   b. Accounted for known population displacements;

   c. Used local government data on population changes;

   d. Conducted targeted surveys to verify current population distributions.

68. The Legislature did none of these things because doing so would have interfered with its partisan gerrymandering objectives.

69. Where a state voluntarily redistricts mid-decade for partisan purposes, it cannot claim a good faith justification for population deviations.

C. *Dilution of Plaintiff Issa's Vote*

70. As a California voter residing in proposed District 49, Plaintiff Issa's vote will be diluted by AB 604's scheme:

   a. Districts drawn on stale population data artificially inflate or deflate individual votes depending on whether district population has declined or grown since 2020;

b. Districts drawn for partisan advantage without regard to current population distribution violate equal protection;

c. Plaintiff Issa's vote will count less than voters in districts that have lost population since 2020, and differently than voters in districts that have gained population.

71. This vote dilution is not de minimis:

a. While AB 604's districts show zero or one-person deviations from ideal district size when measured against 2020 data, they show unknown and unjustified deviations when measured against the current actual population;

b. In areas affected by wildfire displacement alone, tens of thousands of residents have relocated, fundamentally altering district populations;

c. These population shifts are not evenly distributed—some districts have lost substantial population while others have gained.

72. Because AB 604 makes no effort to account for five years of population changes, it cannot satisfy equal protection requirements.

73. By reason of the foregoing, Plaintiff is entitled to a preliminary injunction and ultimately a permanent injunction, enjoining Defendants' implementation of the ERRA.

74. Plaintiff is also entitled to a declaratory judgment that California's enactment of a mid-decade partisan redistricting, the ERRA, and Defendants' implementation of the ERRA, violate the Equal Protection Clause of the Fourteenth Amendment.

## COUNT II
*Violation of Equal Protection—Deprivation of Rights Under Color of State Law*
*42 U.S.C. § 1983*

75. Plaintiffs reallege and incorporate by reference all preceding paragraphs.

76.     The Fourteenth Amendment prohibits states from denying equal protection of the laws.

77.     Defendants, acting under color of California law, have deprived and will continue to deprive Plaintiffs and California voters of equal protection by:

    a.  Implementing congressional districts that violate one person, one vote requirements;

    b.  Manipulating district lines for impermissible partisan purposes;

    c.  Disregarding known population changes in favor of stale census data;

    d.  Abandoning the nonpartisan redistricting process California voters enacted.

78.     These actions constitute hyper-partisan gerrymandering which violates equal protection when combined with the one person, one vote violations alleged herein.

79.     Plaintiffs allege

    a.  Population inequality arising from use of stale census data;

    b.  Failure to make a good-faith effort to achieve equal population;

    c.  Partisan motivation that prevents California from justifying population deviations;

    d.  Mid-decade redistricting that lacks the constitutional justifications applicable to mandatory post-census redistricting.

80.     Plaintiff Issa, as a California voter who will cast ballots in unconstitutionally drawn districts, has standing to bring this § 1983 claim for declaratory and injunctive relief.

81.     By reason of the foregoing, Plaintiff is entitled to a preliminary injunction and ultimately a permanent injunction, enjoining Defendants' implementation of the ERRA.

82.    Plaintiff is also entitled to a declaratory judgment that California's enactment of a mid-decade partisan redistricting, the ERRA, and Defendants' implementation of the ERRA, violate 42 U.S.C. § 1983.

### COUNT III
*Violation of the Elections Clause*
*U.S. Const. art. I, § 4*

83.    Plaintiffs reallege and incorporate by reference all preceding paragraphs.

84.    The Elections Clause provides: "The Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof; but the Congress may at any time by Law make or alter such Regulations, except as to the Places of chusing Senators."

85.    The Elections Clause vests authority in "the Legislature thereof"—meaning the state legislature acting in its legislative capacity, subject to the constraints of the state's constitution and internal procedures.

86.    In *Arizona State Legislature v. Arizona Independent Redistricting Commission*, 576 U.S. 787 (2015), the Supreme Court held that "Legislature" in the Elections Clause encompasses a state's lawmaking processes, including citizen initiatives, but does not permit state legislatures to violate their own state constitutions when regulating federal elections.

87.    The ERRA and its adoption of AB 604 exceed California's own constitutional limits, "representing an unlawful attempt in several respects to exercise authority that the Legislature does not possess." Emergency Petition for Writ of Mandate or Other Extraordinary or Immediate Relief, *Senator Tony Strickland et al. v. California Secretary of State Shirley N. Weber and the California Legislature*, Case No. S292490 (Cal. Sup. Ct. Aug. 25, 2025) at *3 (the

"California Complaint"). As such, and as argued by Senator Tony Strickland and his co-plaintiffs, AB 604 and the ERRA are *ultra vires*.

88.     Additionally, the California Legislature failed to adhere to the constitutionally required waiting period for new legislation, further evidencing its *ultra vires acts*. California Complaint at *28.

   a.  Article IV, § 8(a) of the California Constitution requires that bills be heard or acted upon only after the 31st day following introduction, unless three-fourths of each house votes to dispense with this requirement;

   b.  Article IV, § 8(c)(1) requires that statutes take effect on January 1 following a 90-day period from enactment, unless the statute is designated as an urgency measure;

   c.  The ERRA was introduced in mid-August 2025, passed on August 21, 2025, and designed to take immediate effect for the November 4, 2025 election—a timeline that necessarily required bypassing normal waiting periods;

   d.  Article IV, § 8(d) permits "urgency statutes" only when "necessary for immediate preservation of the public peace, health or safety" and requires two-thirds votes in each house;

   e.  Partisan redistricting designed to "neutralize" another state's electoral choices is not a matter of "public peace, health or safety" and does not justify urgency procedures;

   f.  Even if the Legislature invoked urgency procedures, those procedures were improperly used because the ERRA does not meet the constitutional definition of urgency legislation;

g.   The Legislature's violation of procedural requirements demonstrates that the ERRA was not a legitimate exercise of legislative authority but rather an unconstitutional power grab rushed through to affect the 2026 elections.

89.   California's Legislature, in passing AB 604 and ACA 8, therefore acted *ultra vires* and beyond its constitutional authority under California law:

a.   Article XXI, § 1 of the California Constitution, which is not subject to amendment by Proposition 50, limits redistricting to the year following the decennial census;

b.   Article XXI, § 2(e), likewise not subject to amendment by Proposition 50, prohibits drawing districts to favor or discriminate against a political party;

c.   California voters deliberately removed redistricting authority from the Legislature and vested it in an independent Commission through Proposition 20 (2010);

90.   Even if California voters approve Proposition 50, the resulting redistricting scheme violates the Elections Clause because:

a.   It commandeers California's redistricting process in contravention of the nonpartisan system California voters enacted;

b.   It manipulates district lines for the express purpose of affecting the partisan composition of Congress—a purpose beyond the proper scope of a state's authority;

c.   It represents an impermissible interstate attempt to nullify the electoral choices of voters in other states, including those in Plaintiff Ronny Jackson's Congressional District.

91.   The Elections Clause does not authorize one state to deliberately manipulate its congressional districts to override or nullify the representative choices of other states' voters.

25

92.    By reason of the foregoing, Plaintiff is entitled to a preliminary injunction and ultimately a permanent injunction, enjoining Defendants' implementation of the ERRA.

93.    Plaintiff is also entitled to a declaratory judgment that California's enactment of a mid-decade partisan redistricting, the ERRA, and Defendants' implementation of the ERRA, violate the Elections Clause.

### COUNT IV
*Violation of the Guarantee Clause*
*U.S. Const. art. IV, § 4*

94.    Plaintiffs reallege and incorporate by reference all preceding paragraphs.

95.    Article IV, Section 4 provides: "[t]he United States shall guarantee to every State in this Union a Republican Form of Government, and shall protect each of them against Invasion; and on Application of the Legislature, or of the Executive (when the Legislature cannot be convened) against domestic Violence."

96.    The Guarantee Clause ensures that states maintain republican forms of government characterized by:

   a.  Representative democracy;

   b.  Elections free from manipulation;

   c.  Checks on government power;

   d.  Respect for fundamental democratic principles.

97.    California's redistricting scheme violates the Guarantee Clause by:

   a.  Manipulating electoral outcomes through mid-decade partisan gerrymandering expressly designed to determine congressional control regardless of how voters vote;

b. Ignoring California's own constitutional constraints, including Article XXI's redistricting schedule and anti-gerrymandering provisions;

c. Overriding the independent redistricting process California voters enacted through Proposition 20, thereby eliminating a critical check on legislative power;

d. Retaliating against other states' electoral choices by manipulating district lines to nullify those choices' effects on congressional composition.

98.     California's actions stray from republican governance by concentrating power in the Legislature to manipulate election outcomes for partisan advantage, free from the constitutional and procedural constraints California voters imposed.

99.     By targeting Plaintiffs' representative capacity and seeking to dilute the effect of Plaintiff Ronny Jackson's voters' choices in federal elections, California's scheme undermines republican government both within California and nationally.

100.    By reason of the foregoing, Plaintiff is entitled to a preliminary injunction and ultimately a permanent injunction, enjoining Defendants' implementation of the ERRA.

101.    Plaintiff is also entitled to a declaratory judgment that California's enactment of a mid-decade partisan redistricting, the ERRA, and Defendants' implementation of the ERRA, violate the Guarantee Clause because California failed to comply with its own constitutional requirements, manipulated its electoral processes with interstate effects, and injured Plaintiff members of Congress and their voters in a concrete manner.

## DEMAND FOR JURY TRIAL

Plaintiffs demand a jury trial as to all issues so triable.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs respectfully request that this Court:

(a) Enter a preliminary injunction: (i) Enjoining Defendants from implementing AB 604's congressional district map if Proposition 50 is approved by California voters; (ii) Requiring California to use its current congressional district map (drawn by the Citizens Redistricting Commission in 2021) for the 2026 congressional elections; (iii) Alternatively, enjoining Defendants from certifying Proposition 50 election results pending final adjudication of this action on the merits.

(b) After trial or hearing on the merits, enter a permanent injunction: enjoining Defendants from implementing AB 604's congressional district map and requiring California to use its current congressional district map (drawn by the Citizens Redistricting Commission in 2021) for the 2026 congressional election;

(c) Enter declaratory judgments that: (i) AB 604's congressional district map violates the Equal Protection Clause (U.S. Const. amend. XIV) and the one person, one vote requirement; (ii) Defendants' implementation of AB 604 would violate 42 U.S.C. § 1983 by depriving Plaintiffs and California voters of equal protection under color of state law; (iii) ACA 8, AB 604, and the ERRA violate the Elections Clause (U.S. Const. art. I, § 4); (iv) The ERRA and California's redistricting scheme violate the Guarantee Clause (U.S. Const. art. IV, § 4); (v) California lacks constitutional authority to conduct mid-decade redistricting using stale census data for partisan purposes; and (vi) Plaintiffs have standing to bring these claims and will suffer irreparable injury absent injunctive relief;

(d) Award Plaintiffs their reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988 and other applicable law;

(e) Grant such other and further relief as the Court deems just and proper.

Date:   October 29, 2025

Respectfully submitted,

*/s/Chris D. Parker*
Chris D. Parker
TX Bar. No. 15479100
Farris Parker & Hubbard
A Professional Corporation
P.O. Box 9620
Amarillo, TX 79105-9620
(806) 374-5317
cparker@pf-lawfirm.com


*/s/ Edward Andrew Paltzik*
Edward Andrew Paltzik
Texas Bar No. 24140402
Taylor Dykema PLLC
925 E. 25th Street
Houston, Texas 77009
(516) 526-0341
edward@taylordykema.com

*Counsel for Plaintiffs Representative Ronny*
*Jackson and Representative Darrell Issa*