# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
### AMARILLO DIVISION

| | |
|---|---|
| REPRESENTATIVE RONNY JACKSON, in his individual capacity and as U.S. Representative for Texas's 13th Congressional District, and REPRESENTATIVE DARRELL ISSA, in his individual capacity and as U.S. Representative for California's 48th Congressional District,<br><br>    Plaintiffs<br><br>v.<br><br>SHIRLEY N. WEBER, in her official capacity as California Secretary of State, and GAVIN NEWSOM, in his official capacity as Governor of California,<br><br>    Defendants. | Case No. 2:25-cv-00236-Z |

## DECLARATION OF REPRESENTATIVE RONNY JACKSON IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

I, Ronny Jackson, pursuant to 28 U.S.C. § 1746, declare under penalty of perjury that the following is true and correct based on my personal knowledge:

1. I am over the age of eighteen (18) and competent to make this Declaration.

2. I am the duly elected United States Representative for Texas's 13th Congressional District, having been first elected in November 2020 and reelected in November 2022 and November 2024.

3. I maintain my principal residence in Amarillo, Texas, within the Northern District of Texas, Amarillo Division, which is located within the 13th Congressional District.

4. Prior to my service in Congress, I served as a Rear Admiral in the United States Navy Medical Corps for 25 years, including service as Physician to the President under Presidents Barack Obama and Donald J. Trump.

5. I currently serve as Chairman of the House Permanent Select Committee on Intelligence Subcommittee on Oversight and Investigations (an "Intelligence Subcommittee"). I have held this position since January 2025, when House Republican leadership appointed me to this chairmanship. I am poised to serve as a full Committee Chairman in the next Congress. I also serve as Co-Chair of the Congressional Israel Allies Caucus.

6. I also currently serve as Chairman of the House Armed Services Committee Subcommittee on Intelligence and Special Operations (an "Armed Services Subcommittee"). I have held this position since January 2025.

7. These chairmanship positions are held exclusively by members of the majority party in the House of Representatives. If control of the House flips from Republican to

Democratic, I will automatically lose both chairmanships on the day the new Congress convenes (January 3, 2027).

    8.    As Chairman of an Intelligence Subcommittee, I have the following specific authorities and responsibilities:

    a. Subpoena Authority: Subject to approval by the full House Permanent Select Committee on Intelligence, I have the authority to issue subpoenas compelling testimony and production of documents for subcommittee investigations within my jurisdiction;

    b. Investigation Direction: I direct and supervise all investigations conducted by the subcommittee within its jurisdiction, which includes oversight of intelligence community activities, counterintelligence matters, and intelligence-related expenditures;

    c. Hearing Authority: I control the subcommittee's hearing schedule, including authority to convene hearings, select witnesses, and determine the scope and focus of each hearing;

    d. Budget Authority: I exercise control over the subcommittee's allocated budget, including authority to direct spending on investigations, staff travel, expert consultants, and other resources necessary to fulfill oversight responsibilities;

    e. Staff Supervision: I supervise subcommittee professional staff members who conduct investigations, draft reports, analyze intelligence materials, and support the subcommittee's work;

 f. Classified Access: I receive regular classified briefings on intelligence community activities, including counterintelligence threats, covert operations, intelligence budget matters, and other sensitive information necessary to conduct effective oversight; and

 g. Agency Oversight: I oversee the activities of the Central Intelligence Agency, National Security Agency, Defense Intelligence Agency, and other intelligence community components with respect to matters within the subcommittee's jurisdiction.

9. As an Intelligence Subcommittee Chairman, I currently have access to two professional staff members who assist me in fulfilling these responsibilities. These staff members include:

 a. Intelligence analysts with Top Secret/Sensitive Compartmented Information (TS/SCI) security clearances;

 b. Investigators with expertise in counterintelligence, covert action oversight, and intelligence community operations;

 c. Legal counsel specialized in intelligence law, including the Foreign Intelligence Surveillance Act (FISA), covert action authorities, and intelligence oversight requirements;

 d. Subject matter experts on specific intelligence disciplines (signals intelligence, human intelligence, geospatial intelligence, etc.);

 e. Budget analysts who review intelligence community expenditures and ensure appropriate use of taxpayer funds; and

 f. Communications professionals who handle classified information security and facilitate secure communications for subcommittee work.

10. These staff resources enable me to conduct oversight effectively. For example: When a constituent raises concerns about intelligence community activities affecting Texas or national security, my staff can investigate those concerns, request briefings from relevant agencies, and pursue appropriate remedies; When media reports raise questions about potential intelligence failures or misconduct, my staff can initiate investigations, interview witnesses, review classified materials, and prepare reports for the subcommittee; When legislation affecting intelligence community authorities comes before Congress, my staff provides analysis, drafts amendments, and ensures the subcommittee's perspective is reflected in legislative deliberations.

11. Without these staff resources, I could not effectively fulfill my oversight responsibilities. The intelligence community consists of 18 separate agencies with combined budgets exceeding $90 billion annually. Effective oversight requires substantial staff support to review agency activities, analyze classified programs, and conduct investigations.

12. As Chairman of an Armed Services Subcommittee on Intelligence and Special Operations, I have similar authorities and responsibilities:

   a. Oversight of DOD Intelligence: I oversee Department of Defense intelligence activities, including the Defense Intelligence Agency, National Security Agency, National Geospatial-Intelligence Agency, and National Reconnaissance Office;

   b. Special Operations Oversight: I oversee U.S. Special Operations Command and special operations forces, including covert and clandestine military operations;

   c. Authorization and Appropriations: I participate in authorizing and appropriating funds for defense intelligence and special operations programs, ensuring appropriate resource allocation;

    d.   Hearing and Investigation Authority: Like my Intelligence Subcommittee role, I control the hearing schedule, direct investigations, and select witnesses for matters within the subcommittee's jurisdiction; and

    e.   Classified Program Access: I receive classified briefings on sensitive military intelligence and special operations programs necessary for effective oversight.

13.    An Armed Services Subcommittee provides similar professional staff support, though the exact staffing varies by subcommittee. As Chairman, I have access to approximately five additional professional staff members supporting an Armed Services Subcommittee's work, including military affairs analysts, budget specialists, and legal counsel.

14.    Texas's 13th Congressional District spans 38 counties in the Texas Panhandle and includes significant military and defense-related installations and populations, including Sheppard Air Force Base and national security-related government facilities, including the Pantex Plant – one of six production facilities in the National Nuclear Security Administration's Nuclear Security Enterprise. My chairmanship of the Intelligence and Special Operations Subcommittee and the Intelligence Subcommittee and the Armed Services Subcommittee enables me to conduct oversight affecting these installations and the servicemembers and families who live in my district.

15.    Earlier this year, California state officials embarked on an "emergency" midcycle redistricting plan explicitly retaliating against Texas and its elected representatives, including me. California's Legislature passed Assembly Constitutional Amendment No. 8 - tellingly titled the "Election Rigging Response Act" (the "ERRA") - and Defendant Governor Newsom signed it into law on August 21, 2025.

16. The ERRA is an unprecedented attempt by California's government to unilaterally reconfigure its congressional districts mid-decade for the express purpose of engineering a partisan advantage in the House of Representatives.

17. The ERRA openly declares its aim to "neutralize the partisan gerrymandering being threatened by Republican-led states"-in other words, to counteract Texas's political influence by manipulating California's representation in Congress.

18. As set forth in my Complaint, the ERRA is expressly aimed at Texas and its congressional delegation, including myself.

19. The ERRA alters congressional representation in a way designed to engineer a Democratic majority in the House of Representatives.

20. If implemented, this scheme would cause me to lose my subcommittee chairmanships, reduce my staff resources, and diminish my legislative influence.

21. My influence over the congressional majority would cause me to lose serving as client in impact litigation cases.

22. The ERRA would also dilute the representational voice of my constituents in Texas's 13th District because it directly threatens the existing House majority that reflects their votes and policy preferences.

23. If congressional elections proceed under the ERRA, these injuries will be immediate and irreparable, as once the House majority is changed, my committee leadership and my constituents' influence cannot be restored for that term of Congress.

24. California currently has 43 Democratic representatives and 9 Republican representatives (of 52 total seats); AB 604's redistricting map is designed to increase the number of Democratic seats California sends to Congress; Election analysts predict AB 604's map could

7

yield 4-6 additional Democratic seats compared to California's current congressional districts, based on historical voting patterns in the reconfigured districts; and If Democrats gain 2-3 seats nationally in the 2026 elections, they could control the House beginning January 2027.

25. Given these facts, California's AB 604 redistricting directly threatens Republican House control and my chairmanships.

26. This causal chain is not speculative—it is highly probable because AB 604's map is specifically designed to yield Democratic gains.

27. The ERRA's legislative findings openly state the map is designed to "neutralize partisan gerrymandering" and ensure Democrats can "provide an essential check and balance" in Congress.

28. The losses I will suffer are irreparable because:

a. They cannot be remedied through money damages—there is no way to compensate me (or my constituents) monetarily for loss of oversight authorities and representational capacity;

b. Defendants have sovereign immunity from damages under the Eleventh Amendment;

c. Once I lose my chairmanships, I cannot be restored to them mid-Congress—committee assignments remain fixed for the entire two-year Congress;

d. My constituents' loss of effective representation cannot be remedied retroactively.

29. The timeline for these injuries is extremely compressed:

a. November 4, 2025: California voters decide Proposition 50;

b. December 12, 2025: Secretary must certify election results;

c. Mid-December 2025: Candidate filing begins for June 2026 primary;

d. June 2, 2026: Primary election;

  e. November 3, 2026: General election; and

  f. January 3, 2027: New Congress convenes; I lose chairmanships if Democrats control House

30. If this Court does not preliminarily enjoin AB 604's implementation, these injuries will occur within approximately 14 months and will be impossible to fully remedy at that point.

31. A preliminary injunction enjoining AB 604's implementation would prevent my anticipated injuries: Maintaining current districts would prevent Democrats from gaining the 4-6 additional California seats AB 604 is designed to provide; Preventing those gains would likely prevent Democrats from flipping House control (given the narrow current margin); Maintaining Republican House control would preserve my chairmanships and associated authorities; Preserving my chairmanships would preserve my enhanced ability to represent my constituents' interests.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on October 29, 2025, in Washington, D.C.

                     *[signature: Ronny Jackson]*
                     box SIGN  1R9PY66X-18JVY8Q2
                     U.S. Representative Ronny Jackson